Good morning. Good morning. Even under the strictest reading... Could you state your name for the record, please, because we're making an audio recording here. On behalf of Appellant Ann Turner, certified law student under the supervision of Attorney Paul Hoffman, and my partner Jim Miller. Thank you. Under even the strictest reading of the Ninth Circuit standard, this is a case of exceptional circumstances. This was a complex... Sorry. This is a case of exceptional circumstances under even the strictest reading of the Ninth Circuit standard. My client lacked the ability to plead his own case in light of its complexity. My client suffered, at the base of this case, a traumatic brain injury based on cooperation with defendants. Because of this, he told the court multiple times that he could not understand what was happening, he did not know how to proceed, and he was having trouble reading and writing. Well, counsel, I mean, Judge Windmill makes a big point, correctly so in my view, saying your client was a remarkably zealous advocate who filed every conceivable motion in a way that made sense legally. So, what is it that he didn't get? Well, my client, he was absolutely prolific. And he was very clear that he was copying these briefs out of prisoner's litigation handbooks. And this explains why he filed motions, as well as ones that made sense, ones that completely didn't. For instance, he asked for attorney's fees. And he asked for a Spears hearing, which I don't believe is done in this circuit. But the standard is, you know, complexity of the issues. This is not that complicated. He was attacked, and the issue was were the circumstances such that he was improperly put in a zone of danger where he shouldn't have been in. That's not all that complicated. And the law in these cases is relatively straightforward and is accessible to pro per pro se plaintiffs. So, what's exceptional about this? Well, I would disagree with your characterization that this is not a complex case. This case involves three groups of defendants, one of which is a private corporation that requires a Manel analysis. This court in Egaman found that where a plaintiff was housed in a private corporation, that that made the case complex. And that was one of the reasons it reversed and appointed counsel. But the circumstances that make this case different from any other prisoner case is his traumatic brain injury. It's the fact that there was the snitch status, which prevented him from being able to speak openly about the fact that he came. He suffered serious injuries. I don't argue with you about that. But I don't see anything in the record that says he had permanent traumatic brain injury such that he couldn't litigate the case. I don't see anything that says that. Where does it say that? Well, in our reply brief on page 5 is where we discussed the traumatic brain injury. But rather than your reply brief, tell me where in the record there was a finding or evidence that he suffered traumatic brain injuries such that he couldn't properly read or write or communicate or think. I don't see that. I'll have to get back to you with the specific page numbers for those medical filings. However, the court was clear that his briefing was unwieldy, vague, conclusory, confusing, illegible, largely unhelpful. Well, but that's because he was filing 320-page complaints. That's not because he had traumatic brain injury. No, but they were illegible because of his double vision because of his injuries. And this goes to part of the circumstances that the court could not even read some of his filings. And, yes, he was prolific, but that's irrelevant to how the quality of this work and whether or not he could do his own claims. And that's completely – that's not – you can't reconcile the fact that he had this ability with the fact that most of his motions were dismissed. Almost all of his discovery motions were thrown out after the court called him unwieldy, vague, conclusory, largely unhelpful. But the court also found that he had this ability, and then it would dismiss all of his claims, and these things don't reconcile. It's the serious medical need here, and as well as these extra facts, the snitch status, the unique problems about his – the fact that he kept being moved that show that his filings were simply insufficient. In response to Judge Donato's question, did he bring to the attention of the district court that he was having vision and other cognitive problems, concentration problems? Yes, multiple times, and I will bring those citations back to you on Monday. I think they were in his motion for appointment of counsel. Was that where that was? Yes, and they're also in his original complaint and letters to the court. Okay. Thank you. Pass the baton to Mr. Miller. Good morning. Good morning. I'm going to demonstrate how – I need your name for the record. Oh, Jim Miller. Thank you. Counsel for Appellant. I'm going to demonstrate how, despite his limited capacity to litigate this case, Appellant has still presented evidence of Eighth Amendment and Idaho State court law violations that should have been sufficient to preclude summary judgment. However, in contrast to the typical summary judgment standard where all evidence is construed in the light most favorable to the nonmoving party, the district court frequently found in the light most favorable to defendants in ruling on its motion for summary judgment. The most stark illustration of this contention is its treatment of the video evidence. Tell me if I have this wrong. Judge Windmill says, yes, I understand. Olson has one story. The defendants have another story. Ordinarily, that would be a conflict precluding summary judgment. He's looked at the video, and he says the video just completely refutes Olson's claims. He did say that with regard to the video. Other relevant material evidence was simply not addressed in that motion for summary judgment. Well, why is he wrong about the video? The video is incorrect because, first, the video does not show what the district court said it shows with regard to Deputy Berry. It does not show Deputy Berry not ever stepping foot outside, as the defendants initially stated in their brief. They have actually backpedaled on their own briefing and acknowledge now that he did step out into that recreation yard and enough time elapsed on the video so that that conversation could have occurred. Second, that video is very, very, very poor quality, such a poor quality that it is difficult to see how anything not depicted on the video could have blatantly contradicted appellant's testimony such that no reasonable juror could believe it. I don't understand what you mean by that. The video only shows one frame for every four seconds that elapsed. In particular, the outside recreation yard footage is extremely blurry. It's only a quarter of a screen, one camera. It has four cameras just for that little screen. And it's very blurry, very difficult to make anything out in this sort of stop motion that the video demonstrates. It is very difficult to see how anything that occurs on that video could blatantly contradict appellant's testimony. And, in fact, the video supports… Judge Bindel's point was that the video shows that Olson was not together with one of the deputies when Olson says he was. With regard to Deputy Rensland, the district court said that Rensland at that time wasn't in the hallway, so he could not have possibly witnessed that conversation. Olson's testimony is blatantly contradicted. However, in Olson's appellant's complaint, he alleges that Deputy Rensland was standing in the doorway of the hallway, which is not shown on that videotape, watching the confrontation occur. Further, the district court missed this on the… Is there a problem with the tape, not that it's every four seconds, but that it didn't have the hallway within the field of view? Is that the problem? The every four seconds… That is one of the problems. But the other issue of the every four seconds was Deputy Rensland could have appeared in that hallway and moved on, and we may have never known. The district court actually did miss Deputy Rensland reappearing in that hallway just 20 seconds before that conversation or that fight began. So it's entirely possible that they could have missed him stepping into that hallway after the conversation was finished and moving on to the lunchroom. This is just with regard to the video with the dispute of facts that was acknowledged by the district court. There are other unacknowledged disputes of fact that are very material to this case. First, there is the conversation that appellant had with Deputy Holsing when Olson was to be transferred or when Ezell was to be transferred into the facility. They did an extra sort of screening with Olson where they asked him, we're bringing in a guy from the ICIO from the interim prison. Do you know this guy? Is it okay if we bring him in here? Olson said, I've known him for a long time. It should be fine. However, Ezell, as we all know, was the ultimate party that was transferred. This is significant because it reveals the subjective knowledge of the Clearwater County defendants that Olson did have this protected status to him that care should be taken in housing him. They don't dispute that. I believe they do dispute whether. Why they moved him from the one prison to the other to begin with. There were three prisons in total, Your Honor. The move for the initial move from the site of the prison riot to the interim prison was for that reason. But later. The dispute of fact that you're telling us about now, I'm not following you. The dispute of fact I'm talking about now is whether the Senate holsing at the CCJ, that third jail where Olson was assaulted, had a conversation with him saying, it's okay if this man, Gary Walters, comes in and he's your coworker, right? Who says that conversation occurred? Olson says that conversation occurred. Defendants say that conversation. They did not say that it occurred. And the district court did not mention it. Why does it matter? It matters because. Okay. So let's assume you're right. All right. So they said, inmate A is going to come over and they talk to your client about it. And he said, fine. And then, unfortunately, inmate A doesn't show up. Inmate B does. But then there's a whole dialogue about inmate B in which your client says things like, we're getting along fine. I have no problem with him. And he never tells anybody at any time he's got a specific concern about Ezell. So what is the fact issue that hangs up summary judgment? First, to address the second part of your points, he does make a comment immediately to Deputy Barry that something is very wrong. This man is not my friend. But he was wrong about that because the record showed that he and Ezell, the record showed, apart from any testimony, the document showed they were actually housed together previously. So your client was wrong when he said, I don't know this man. You can't create your own fact disputes by saying, oh, I deny my previous knowledge. I mean, you know that. You can't do that. I understand, Your Honor. What Olson said in his declaration was that we were not previous coworkers, nor were we friends. It was that characterization that unsettled him during that initial part. They did not actually have much contact at all at that interim prison. But the counsel, I mean, saying when Ezell says we're buddies, and there's no evidence that he did. Let's just assume for your benefit he did. And Olson says, no, we were never friends. How does that suddenly become adequate warning to the state that Olson is in danger of being attacked? I just don't see that. By itself, it may not be. But the later conversation he had with Barry where he talked about how uneasy he was around this man, how he feared an attack, coupled with the fact that they knew that Olson was a protected individual. Your client admitted Olson acknowledged that he told Barry, quote, we are getting along fine, close quote. He said we're getting along fine. Everything's great. But that doesn't change the fact that later he said that we weren't. Later he said he was, quote, uneasy, close quote. He didn't say anything else. He said I'm uneasy at best. He didn't say, well, Ezell threatened me. Ezell said he's going to get me. I'm terrified. Ezell may have not said anything, but I get a bad vibe from him. I'm terrified. He didn't say anything. He said, yeah, I'm a little uncomfortable. But, I mean, how does that rise to the level of deliberate indifference? When coupled with the prison's knowledge that he is a suspected snitch and that he was moved, as your honors stated, because he feared an assault at ICIO and that the prison administration knew of this. That seems to couple to create at least a reasonable juror could conclude that there were, that he was assaulted on the basis of his snitch reputation. This rose to the level of deliberate indifference by the staff. I see I'm out of time. If there are no further questions. Great. Thank you. We've got 2.35 left for rebuttal. Okay. Good morning. Let me get the line up here. Who's appearing for whom? Good morning, your honor. My name is Sonia Lee Neutch. I'm going to be representing, or am representing the Clearwater County jail deputies. We've agreed to divide up our time five minutes each for each of the groups of appellees, and so I will just get right to it. You said five minutes each? Five minutes each, correct, your honor. Thank you. Thanks. Good morning. Good morning. Essentially, your honors have hit specifically on all the issues already that are at play, and that is whether or not the video evidence as far as the Clearwater County jail deputies are concerned blatantly contradicts Mr. Olsen's claims in this case, and we believe that it clearly does. We're looking at a deliberate indifference standard, which requires that these deputies actually subjectively drew the inference, not just that it's a possibility, but that they subjectively drew the inference that Mr. Olsen was somehow at risk of being attacked by Mr. Ezell. Mr. Olsen claims throughout, you see, that he has been labeled as such. I have to say, I didn't understand why Ezell showed up after there was this whole dialogue about another inmate. I mean, doesn't it seem a little odd that all of us, and they made no effort to check with Mr. Olsen. He just, all of a sudden, they talk about inmate A, are you okay with this, is everything good, and then they say, well, we changed our mind, here's inmate B, and we're not going to ask you about him. Well, in relation to the Clearwater County jail deputies, we had no determination as to who was going to be coming. You have to understand that we have a local jail, and the trustees are provided by the state facility. We do not do any type of determination. Yeah, but it was your staff that made its effort to go talk to Mr. Olsen about his concerns before the trial, and they didn't do that with Mr. Ezell. Why not? When Mr. Ezell arrived, they were just as shocked as anyone else that he was the one instead of Mr. Walters who had showed up, and they did have a conversation with Mr. Olsen at that time, and they said, Mr. Ezell is who has shown up, and Mr. Ezell says that he's worked together with you before, and Mr. Olsen said, I don't believe that we've worked together before, and then that evening, which is October 30, 2009, Deputy Berry specifically goes and talks to Mr. Olsen and says, how are things going? I mean, he is doing the follow-up. They're doing exactly that. It's not our job to screen these particular inmates. It's not our job to make that determination as to who is coming, who gets trustee status from the state. That's all part of their regulations and what they're able to do as far as providing us with an inmate, but we certainly did contact Mr. Olsen that evening and asked, how are things going, and he said they were absolutely going fine, that there were no issues, and then we have the next morning. I mean, this guy's here for less than 24 hours, and there wouldn't have been any indication, even if there had been a discussion about Mr. Olsen and Mr. Ezell having a conversation about a particular riot because you have to understand they lived in the same housing unit where this riot occurred. What does Olsen say he told your deputies? He says that on the first night, he says, I do not argue that we were getting along fine, but I did tell him that we had established that we had never worked together, so he acknowledges that he, in fact, said to them that they were getting along fine. What else does he say? Then the next morning, he says that when they went outside with Deputy Berry, he claims that on his way out to the recreation yard, that they had this big lengthy conversation in the recreation yard, which is clearly where the video blatantly comes in. What does he say he said at that time? During that conversation, Mr. Olsen claims that he told him that he had been talking to Ezell, that Ezell had brought up the riot where they had lived together before, that Ezell had talked about why he was in jail or why he was in prison, the length of time that he was going to be there. He talked about the fact that Mr. Ezell was not good at making lasagna because he couldn't make lasagna for 20 people with two small pans, and that they ended the conversation that, mind you, Your Honor, would have taken several minutes to have occurred, and the video clearly shows that the conversation did not happen. Unfortunately, there was no audio, so we don't really know what was said. Is that right? There's no audio on the video, but you can see in the video that Deputy Berry opens the door, Mr. Olsen walks past him, and when the door is shut, Mr. Olsen is completely at the other end of the recreation yard. So this conversation that would have taken minutes could not have occurred in the seconds that the door was opened and then shut. But even so, the conversation ends with the statement of, so we talked, it may take a lot of coaching and training with Mr. Ezell. So there was no discussion, even if you assume that that several-minute-long conversation happened, there was nothing in that conversation that would have led Deputy Berry to presume that subjective inference, that he would have to presume that there was an issue, that Mr. Ezell was going to somehow attack Mr. Olsen. It's just simply not even in that conversation. Are you or one of your colleagues going to handle the issue of whether a counsel should have been appointed? Yes, my colleagues are going to be handling that, and I see I'm out of time. I don't want to take up any more of their time, so thank you, Your Honor. Thank you. Good morning. Good morning. May it please the Court, I'm Andy Brassi. I represent the IDOC defendants in this case, the state defendants. In this case, Mr. Olsen sued five defendants in the briefing that was done here at the Ninth Circuit. There was no evidence or no argument made against the defendants, Mr. Smith, Siegert, and John Blonk, and we believe they've effectively abandoned that. It hadn't been my intent, Your Honor, to exactly address the issue on counsel specifically, but I'll talk about that. Well, let me ask you this. So there doesn't seem to be any dispute that Mr. Olsen got pretty severely beat up. No question. So he had a closed head injury. He lost consciousness. He had a large, soft hematoma in the right temporal region, which, as I understand, it means he had a blood clot in the thinking part of his brain, and he was sent on a life flight to a trauma-level hospital. They did. And then that all happens before he starts litigating. So why isn't assistance of counsel just kind of a reasonable precaution here with somebody who's had a massive brain injury? Well, I think you hit the nail on the head, Your Honor, when you talked to counsel earlier, and that is that there's no evidence that I'm aware of in the record that while it's not disputed he had a serious injury, there's no evidence that I'm aware of that that injury precluded him from the ability to think, the ability to write. Judge Windmill, I thought, was very thorough in that regard in that, and Mr. Olsen filed a number of motions, some of which were granted. He had the ability to ask for a stay, which the court gave him, or more time to file a motion for summary judgment. So I guess to answer specifically your question, while he certainly suffered an acute, serious injury, I'm not aware of any evidence. Did Judge Windmill make a formal finding on the brain trauma? I don't think he made a formal finding, Your Honor, that specifically looked at the brain trauma, and counsel who represented the health providers might be able to talk about that more specifically. I don't think he did. And I guess what I would say is when you read Judge Windmill's decision, I mean, it's well thought out. It's thorough. He understood the rule. He understood what the various pleadings that Olsen had filed, and I think made the right decision, particularly with the discretion standard, to not appoint counsel in his case. I understood that Olsen told Judge Windmill in writing somewhere along the line that he was having trouble seeing and having trouble with some kind of mentation. He couldn't concentrate or something of that sort. He may have, Your Honor. I can't point to that in the record. I heard that earlier about vision, but I can't point to you in the record where that was done. And I guess one thing. There. Then what? Well, I think then the issue becomes that if you look at, assuming that's correct, did Mr. Olsen have an ability at that point in time or with those issues to properly frame pleadings, to file pleadings? I can't speak to my next question. I look at the stuff he filed, and it's junk. I mean, it's hundreds of pages of gibberish, basically. I mean, the guy doesn't know what he's doing. He filed a lot of stuff, I grant you, but it's garbage. A lot of it is, Your Honor, but not all of it is. And he had the wherewithal, for example, in 2013 to ask Judge Windmill for more time to present his case on summary judgment, and Judge Windmill granted that, said, fine, you're right. He had the wherewithal to say, wait a minute, he argued over that he hadn't seen the video, and the court is aware of my client's made a declaration or we did on behalf of our client. So Mr. Olsen was able to articulate various pleadings. Your Honor, I grant you, and I've done a lot of this, and I've seen a lot of pleadings, and it's not atypical necessarily, but certainly I feel like Mr. Olsen, more importantly than me, Judge Windmill did, was able to articulate his case before the court. I mean, you can't read Judge Windmill's lengthy summary judgment order and not come away with the idea that he carefully considered this case. He carefully considered Mr. Olsen's position and the pleadings that he filed. And for whatever reason in this case, Mr. Olsen chose, I mean, not to file certain pleadings that the court asked him to file, but went in another direction. So I don't know if that answers your questions about counsel, but it seems to us that under the standard, Judge Windmill made the right decision with regard to not appointing counsel in this case. Now, I don't have much time, I guess I may be out of time, but let me just say this, that with regard to the Eighth Amendment claims and the state negligence claims against the IAOC, I didn't hear really any argument today, and there's no evidence, and there's certainly no compelling evidence, to show that our clients at the IAOC were deliberately indifferent to a substantial risk. Is it your clients that made the decision about Ezell going rather than Walters? Your Honor, when I heard that, I assumed somebody was going to ask me that question, and it was never developed in this case, and I can't sit here and tell you that if, in fact, there was a change, why that change was made. But it's your clients that made that decision. Our clients are under a duty to look at the inmates in certain criteria. Your clients make the decision, yes or no?  They do make it, okay. Yes. All right. Okay. Maybe this doesn't go to your clients, but I was struck by Hulsing asking Olson, what about Walters, and he cleared Walters, but he never asked him about Ezell. Why? I mean, if there's a pattern of asking Olson about individual persons who are about to be brought to be next to him, why didn't they clear Ezell the same way that they cleared Olson? Your Honor, and I can't speak to the communication between the IDOC, the folks at the penitentiary there, and the Clearwater County Jail, and so I can't answer the question of why that deputy would have talked about the first inmate that came or was supposed to come but not Ezell. I suppose I should have asked that of Ms. Nooch. Yeah, but so I apologize, Your Honor. I just can't speak to that. Thank you. Thank you, Mr. Brassi. Good morning. I'm John Burke on behalf of the Corizon Appellees. That's Corizon, LLC, Kim Miller, Linda Gerke, and Michael Tagaki, PA. And I'll mention first that there have been no argument, no evidence as to Kim Miller. We believe any claims are waived against her. Likewise, the counsel had mentioned a Monell claim, and that that's one reason why this case was extraordinary. And, in fact, the district court did not allow the Monell claim to go forward, and that issue has not been raised properly on appeal, and it, too, should not be at issue at this point. Really, the only Eighth Amendment claims remaining as to my clients would be against PA Tagaki and Linda Gerke. And I'll come back to their involvement, but I want to jump to the issue of the appointment of counsel because that seems to be of significant concern. And this is reviewed under an abuse of discretion standard, and certainly Judge Windmill recognized that it was a matter for his discretion, and he applied the appropriate law. The events that took place here and the serious injuries that were sustained by Ms. Jolson occurred in fall 2009. When the court did its initial review order, it was, I believe, November of 2011, and at that point the court denied appointment of counsel and noted that the motions that were pled by the plaintiff were well-reasoned, and Judge Windmill noted an above-average ability greater than other inmates to articulate claims sufficient to protect his interests. That's two years after the injury at issue. And after that time, the plaintiff filed many motions, motions for extension of time, which were granted, a motion for a preliminary injunction and temporary restraining order, which caused significant further briefing by the medical defendants. Judge Windmill, in fact, asked questions about 15 specific areas, and I'd like to talk about some of those, the point being that Mr. Olson was able to articulate his claims and Judge Windmill properly recognized that he was able to do so and there was nothing extraordinary in this circumstance that warranted appointment of counsel. Can I ask you, just on the medical thing, so he had a stent in his nose, I take it. I'm sorry? He had a stent in his nose that was removed, he says, early. Did that cause the septum problem? Is there any evidence that that's what led to his septum problem? There's absolutely no evidence of that, and my belief is that there's no… So the septum problem is totally independent of the nasal stent? He had a collapsed septum. He was diagnosed with that, but there's no evidence that that should be caused by the stent being removed, and, in fact, those stents were removed at Sacred Heart Medical Center, not anywhere where the defendants were providing care. Oh, okay. And if you look at the… So wait, you're saying your clients did not have anything to do with the removal of the stent? That's correct. All right. If you look at SCR 32, it's the district court's order of February 2013, and there are 15 areas of medical concern that the court had specific questions about in relation to the preliminary injunction, and with regard to vision, it was noted that Dr. Berner had found the plaintiff's vision to be 20-20 in each eye, and that was in September 2011. If you look, there were balance issues addressed, there were dental issues addressed, mental health issues, but nothing brain injury per se, and that's because it's not supported in the record. There was nothing in the record, and there were nearly 2,000 pages of medical records produced in this case, and none of them, although Mr. Olson did sustain a concussion, which is itself a traumatic brain injury, there is no evidence to demonstrate that this sequelae from that prohibited him or precluded him from articulating claims and engaging in conversation, writing correspondence. In fact, the record you will see has 35 responses written back from attorneys who he had written to seeking assistance of counsel, so he was able to communicate, he was able to represent his interests. Thank you, Mr. Berner. Ms. Turner or Mr. Miller? Just a few points on rebuttal, Your Honors. First, I'd like to start with the fact that Mr. Olson had 20-20 vision. It does not go to the fact that his problem was double vision, and this was the result of his medical injuries and affected his ability to write in his filings. Additionally, counsel pointed out that the court compared Mr. Olson to any other prisoner, and that is not the standard. The standard is his ability to articulate his own claims. And the evidence of these brain injuries, let me give you those record sightings. The ER report is on the supplemental excerpts at 13 through 14, and it discusses the double vision at, on the original ER, 155 through 157. Additionally, about the video, I'd like to touch on that quickly. Yes, he got more time to view this video. The court gave him 10 days, but it was an abuse of discretion to look at the filings saying that he had had these videos for years, and then decide summary judgment in just nine days when Mr. Olson's claims that he did not have access to actually view these tapes. Additionally, to go back to the Eighth Amendment violations, checking up with Mr. Olson, this conversation. Just on that issue, you know, the record seems to indicate he had plenty of opportunity, and your client said he just didn't have the time. He didn't say he was denied access to DVD player. He just said, I couldn't get around to it, right? That is incorrect, Your Honor. It is correct that he uses the terms, I did not have time, but he is not an attorney and he has an unfortunate way with words, and he explains just a few lines later that he didn't have time because they only just got the equipment in to view these videos after this order came down from the court, and they had such a busy schedule they didn't have time to get him in there to view all of these hours of security footage. So yes, he didn't have time, but that time was never his own. He was never given access until that court order. And then to the checking up issue, that is not sufficient in the Eighth Amendment. It is their job to keep Mr. Olson safe, and when he did go to them and say he needed help and Ezel will attack me, they told him to wait two or three days to talk to the lieutenant when he came back, and by then he was already in the hospital and out of surgery. And to touch on the abuse of discretion for appointment of counsel, it was an abuse of discretion to ignore the fact that his legal mail, outside circumstances, that his legal mail had been destroyed and shredded in some instances, that some of his evidence had been lost between his six moves between closing of discovery and submitting his opposition to summary judgment, and I see that I am out of time. Yes, thank you, Ms. Turner. The case just argued is submitted. We want to really thank the law school at UCI, Professor Hoffman, thank you very much. Nice to see you again. You did a nice job for the appellate. Thank you, too, for the appellate. The case just argued is submitted. I stand in recess.
judges: Donato, Silverman, Bea